# MONTANYE, CORRECTIONAL SUPERINTEND-ENT, ET AL. v. HAYMES

No. 74–520.   Argued April 21, 1976—Decided June 25, 1976

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 244.

*Joel Lewittes,* Assistant Attorney General of New York, argued the cause for petitioners. With him on the briefs were *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Margery Evans Reifler* and *Judith A. Gordon,* Assistant Attorneys General.

*Alvin J. Bronstein* argued the cause for respondent. With him on the brief was *Melvin L. Wulf.**

---

*\*Solicitor General Bork, Assistant Attorney General Thornburgh, Deputy Solicitor General Jones,* and *Peter M. Shannon, Jr.,* filed a brief for the United States as *amicus curiae* urging reversal.

*Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *Edward P. O'Brien,* Assistant Attorney

Mr. Justice White delivered the opinion of the Court.

On June 7, 1972, respondent Haymes was removed from his assignment as inmate clerk in the law library at the Attica Correctional Facility in the State of New York. That afternoon Haymes was observed circulating among other inmates a document prepared by him and at the time signed by 82 other prisoners. Among other things, each signatory complained that he had been deprived of legal assistance as the result of the removal of Haymes and another inmate from the prison law library.[1]

---

General, and *John T. Murphy, Karl S. Mayer,* and *Jean M. Bordon,* Deputy Attorneys General, filed a brief for the State of California as *amicus curiae.*

[1] The document read verbatim:

"Hon. Judge John T. Curtin:

"I am writing to complain that I am now being deprived of legal assistance as a result of inmate Rodney R. Haymes and John Washington being removed from the prison law library.

"Since the removal of the above two from the law library, I cannot any longer obtain any legal assistance either in the nature of obtaining the proper applicable case law corresponding with the particular issue contained in my case, as well as assistance in preparing my post-conviction application to the courts.

"The major problem and reason for my not being able to obtain legal assistance is a direct result of the attitude displayed by the law library officer whom goes out of his way to circumvent inmates legal assistance.

"I feel that this was obviously the same reason why this officer has had Rodney Haymes and John Washington removed from the law library whereby they no longer have proper access to either the law books or myself and the other inmates whom they are legally assisting.

"Wherefore, I feel that my constitutional rights to adequate access to the courts for judicial review and redress is being violated as a direct result of the circumstances and conditions herein set forth.
"[Signed by 82 inmates.]"

The document, which was addressed to a federal judge but sought no relief, was seized and held by prison authorities. On June 8, Haymes was advised that he would be transferred to Clinton Correctional Facility, which, like Attica, was a maximum-security institution. The transfer was effected the next day. No loss of good time, segregated confinement, loss of privileges, or any other disciplinary measures accompanied the transfer. On August 3, Haymes filed a petition with the United States District Court which was construed by the judge to be an application under 42 U. S. C. § 1983 and 28 U. S. C. § 1343 seeking relief against petitioner Montanye, the then Superintendent at Attica. The petition complained that the seizure and retention of the document, despite requests for its return, not only violated Administrative Bulletin No. 20, which allegedly made any communication to a court privileged and confidential, but also infringed Haymes' federally guaranteed right to petition the court for redress of grievances. It further asserted that Haymes' removal to Clinton was to prevent him from pursuing his remedies and also was in reprisal for his having rendered legal assistance to various prisoners as well as having, along with others, sought to petition the court for redress.

In response to a show-cause order issued by the court, petitioner Brady, the correctional officer at Attica in charge of the law library, stated in an affidavit that Haymes had been relieved from his assignment as an inmate clerk in the law library "because of his continual disregard for the rules governing inmates and the use of the law library" and that only one of the inmates who had signed the petition being circulated by Haymes had ever made an official request for legal assistance. The affidavit of Harold Smith, Deputy Superintendent of Attica, furnished the court with Paragraph 21 of the

Inmate's Rule Book,[2] which prohibited an inmate from furnishing legal assistance to another inmate without official permission and with a copy of a bulletin board notice directing inmates with legal problems to present them to Officer Brady—inmates were in no circumstances to set themselves up as legal counselors and receive pay for their services.[3]   The affidavit asserted that the petition taken from Haymes was being circulated "in direct disregard of the above rule forbidding legal assistance except with the approval of the Superintendent" and that Haymes had been cautioned on several occasions about assisting other inmates without the required approval.

Haymes responded by a motion to join Brady as a defendant, which was granted, and with a counteraffidavit denying that there was a rulebook at Attica, reasserting that the document seized was merely a letter to the court not within the scope of the claimed rule and alleging that his removal from the law library, the seizure of his petition, and his transfer to Clinton were acts of reprisal for his having attempted to furnish legal assistance to the other prisoners rather than merely hand out library books to them.

---

[2] Inmates are forbidden, except upon approval of the warden, to assist other inmates in the preparation of legal papers.

[3] The notice read as follows:

"Office of Superintendent
"April 25, 1972

"To ALL CONCERNED:

"In all instances where inmates desire assistance in the use of the Law Library, they are to present their problems to Correction Officer Brady, who will assist them to the extent necessary or will assign inmates on the Law Library staff to particular cases.

"Under no circumstances are inmates to set themselves up as 'legal counselors' and receive pay for their services.

"ERNEST L. MONTANYE
"Superintendent"

After retained counsel had submitted a memorandum on behalf of Haymes, the District Court dismissed the action. It held that the rule against giving legal assistance without consent was reasonable and that the seizure of Haymes' document was not in violation of the Constitution. The court also ruled that the transfer to Clinton did not violate Haymes' rights: "Although a general allegation is made that punishment was the motive for the transfer, there is no allegation that the facilities at [Clinton] are harsher or substantially different from those afforded to petitioner at Attica. . . . Petitioner's transfer was consistent with the discretion given to prison officials in exercising proper custody of inmates." App. 26a.

The Court of Appeals for the Second Circuit reversed. 505 F. 2d 977 (1974). Because the District Court had considered affidavits outside the pleadings, the dismissal was deemed to have been a summary judgment under Fed. Rule Civ. Proc. 56. The judgment was ruled erroneous because there were two unresolved issues of material fact: whether Haymes' removal to Clinton was punishment for a disobedience of prison rules and if so whether the effects of the transfer were sufficiently burdensome to require a hearing under the Due Process Clause of the Fourteenth Amendment.

The court's legal theory was that Haymes should no more be punished by a transfer having harsh consequences than he should suffer other deprivations which under prison rules could not be imposed without following specified procedures. Disciplinary transfers, the Court of Appeals thought, were in a different category from "administrative" transfers. "When harsh treatment is meted out to reprimand, deter, or reform an individual, elementary fairness demands that the one punished be given a satisfactory opportunity to establish

that he is not deserving of such handling. . . . [T]he specific facts upon which a decision to punish are predicated can most suitably be ascertained at an impartial hearing to review the evidence of the alleged misbehavior, and to assess the effect which transfer will have on the inmate's future incarceration." 505 F. 2d, at 980. The Court of Appeals found it difficult "to look upon the circumstances of the transfer as a mere coincidence," *id.,* at 979; it was also convinced that Haymes might be able to demonstrate sufficiently burdensome consequences attending the transfer to trigger the protections of the Due Process Clause, even though Attica and Clinton were both maximum-security prisons.[4] The case was therefore remanded for further proceedings to the Dis-

---

[4] The Court of Appeals found "that the hardship involved in the mere fact of dislocation may be sufficient to render Haymes's summary transfer—if a trial establishes that it was punitive—a denial of due process." 505 F. 2d, at 981. The court said:

"The facts of this case may provide a good illustration of the real hardship in being shuttled from one institution to another. After being sent to Clinton, Haymes found himself several hundred miles away from his home and family in Buffalo, New York. Not only was he effectively separated by the transfer from his only contact with the world outside the prison, but he also was removed from the friends he had made among the inmates at Attica and forced to adjust to a new environment where he may well have been regarded as a troublemaker. Contacts with counsel would necessarily have been more difficult. A transferee suffers other consequences as well: the inmate is frequently put in administrative segregation upon arrival at the new facility, 7 N. Y. C. R. R. Part 260; personal belongings are often lost; he may be deprived of facilities and medications for psychiatric and medical treatment, *see* Hoitt v. Vitek, 361 F. Supp. 1238, 1249 (D. N. H. 1973); and educational and rehabilitative programs can be interrupted. Moreover, the fact of transfer, and perhaps the reasons alleged therefor, will be put on the record reviewed by the parole board, and the prisoner may have difficulty rebutting, long after the fact, the adverse inference to be drawn therefrom." *Id.,* at 981–982.

trict Court. We granted certiorari, 422 U. S. 1055 (1975), and heard the case with *Meachum* v. *Fano, ante,* p. 215. We reverse the judgment of the Court of Appeals.

The Court of Appeals did not hold, as did the Court of Appeals in *Meachum* v. *Fano,* that every disadvantageous transfer must be accompanied by appropriate hearings. Administrative transfers, although perhaps having very similar consequences for the prisoner, were exempt from the Court of Appeals ruling. Only disciplinary transfers having substantial adverse impact on the prisoner were to call for procedural formalities. Even so, our decision in *Meachum* requires a reversal in this case. We held in *Meachum* v. *Fano,* that no Due Process Clause liberty interest of a duly convicted prison inmate is infringed when he is transferred from one prison to another within the State, whether with or without a hearing, absent some right or justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events. We therefore disagree with the Court of Appeals' general proposition that the Due Process Clause by its own force requires hearings whenever prison authorities transfer a prisoner to another institution because of his breach of prison rules, at least where the transfer may be said to involve substantially burdensome consequences. As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight. The Clause does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive.

We also agree with the State of New York that under the law of that State Haymes had no right to remain at any particular prison facility and no justifiable expectation that he would not be transferred unless found guilty of misconduct.  Under New York law, adult persons sentenced to imprisonment are not sentenced to particular institutions, but are committed to the custody of the Commissioner of Corrections.  He receives adult, male felons at a maximum-security reception center for initial evaluation and then transfers them to specified institutions.  N. Y. Correc. Law § 71 (1) (McKinney Supp. 1975–1976); 7 N. Y. C. R. R. § 103.10.  Thereafter, the Commissioner is empowered by statute to "transfer inmates from one correctional facility to another."  N. Y. Correc. Law § 23 (1) (McKinney Supp. 1975–1976). The Court of Appeals reasoned that because under the applicable state statutes and regulations, various specified punishments were reserved as sanctions for breach of prison rules and could not therefore be imposed without appropriate hearings, neither could the harsh consequences of a transfer be imposed as punishment for misconduct absent appropriate due process procedures.  But under the New York law, the transfer of inmates is not conditional upon or limited to the occurrence of misconduct.  The statute imposes no conditions on the discretionary power to transfer, and we are advised by the State that no such requirements have been promulgated. Transfers are not among the punishments which may be imposed only after a prison disciplinary hearing.  7 N. Y. C. R. R. § 253.5.  Whatever part an inmate's behavior may play in a decision to transfer, there is no more basis in New York law for invoking the protections of the Due Process Clause than we found to be the case under the Massachusetts law in the *Meachum* case.

The judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

Respondent's complaint, fairly read, alleges two quite different theories of recovery: First, that he was entitled to a hearing before he could be transferred from one facility to another because the transfer deprived him of an interest in liberty; second, that the transfer was a form of punishment for circulating a petition, for communicating with a court, and for rendering legal assistance to other inmates.

Since respondent has not alleged a material difference between the two facilities, I agree with the Court that the transfer did not cause him a grievous loss entitling him to a hearing. In my opinion this conclusion is unaffected by the motivation for the transfer, because I think it is the seriousness of its impact on the inmate's residuum of protected liberty that determines whether a deprivation has occurred.

I am persuaded, however, that the allegations of his complaint are sufficient to require a trial of his claim that the transfer was made in retribution for his exercise of protected rights. On this claim, the reason for the defendants' action is critical and the procedure followed is almost irrelevant. I do not understand the Court to disagree with this analysis, and assume that the Court of Appeals, consistently with this Court's mandate, may direct the District Court to conduct a trial.*

---

*Respondent alleged in his complaint that his transfer violated his First Amendment rights because it had the purpose of suppressing his attempt to petition the courts, and that any rule which forbade

The reason for my dissent is that the same result would follow from a simple affirmance. Thus, although the Court has explained why it believes the *opinion* of the Court of Appeals should be "reversed," it has not explained why that court's *judgment* was not correct. I would affirm that judgment.

---

him to do that was unconstitutional. It was also disputed whether respondent had actually broken any rule against giving legal advice to other prisoners. It was improper for the District Court either to dismiss the complaint or to grant summary judgment for the defendants without a trial of the facts. *Haines* v. *Kerner,* 404 U. S. 519; *Conley* v. *Gibson,* 355 U. S. 41.