**Lloyd A. MUHAMMAD, Plaintiff,**

v.

**Joseph BUTLER, et al., Defendants.**

**Civ. A. No. 84–5186.**

United States District Court,
D. New Jersey.

Dec. 5, 1985.

Stanley J. Hausman, Caldwell, N.J., for plaintiff.

Catherine M. Brown, Deputy Atty. Gen., Trenton, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

Before the court are the plaintiff's request for injunctive relief and the defendants' cross-motion to dismiss. Plaintiff Lloyd Muhammad is currently incarcerated in Rahway State Prison, serving the 10th year of a life sentence for murder. Plaintiff was originally assigned maximum custodial status, but was reduced to "gang minimum" on January 4, 1983, and then to "full minimum" on June 10, 1983. He was housed in Rahway Camp, a minimum security unit adjoining Rahway prison.

On August 12, 1984, plaintiff was transferred from Rahway Camp to the prison, and on September 12, 1984, his custody status was increased to gang minimum. Apparently one Leester Williams, a former girlfriend of plaintiff's, telephoned the prison authorities to warn them that he was planning to escape. Plaintiff claims that Williams is emotionally disturbed and vindictive towards plaintiff for ending their relationship. Plaintiff was transferred on that basis. The thrust of plaintiff's complaint is that this transfer and increase of custodial status were accomplished in violation of Department of Correction (DOC) standards and the due process clause of the fourteenth amendment.[1]

## BACKGROUND

Inmates in New Jersey state prisons are subject to one of three custody classifications. "Full minimum" custody, the least restrictive status, allows inmates to be assigned either to a minimum security satellite or trailer unit, or to work details, jobs, or programs outside the main institution with minimal supervision, or to both. DOC

---

1. In supplemental papers, *see* letter of plaintiff's counsel, October 23, 1985, plaintiff raises the possibility of a claim for retaliation. As that claim involves disputed facts and plaintiff's claim can in any event be disposed of, at least initially, based on his due process theory, the court will not address plaintiff's retaliation claim at this time.

Standard 853.3(c). Inmates with the next most restrictive status, "gang minimum" or "in and out" custody status, are assigned to activities or jobs which routinely require movement outside the security of the institution, though within the eyesight and under the supervision of corrections officers. 853.3(b). Finally, inmates in "maximum custody" the most restrictive status, are assigned to activities solely within the confines of the institution and under continuous supervision. 853.3(a). Within this scheme, Muhammad's custody level was increased from "full minimum" to "gang minimum".

All prisoners enter the prison system as "maximum custody" inmates. The DOC standards provide an elaborate set of criteria for determining when or whether a prisoner is eligible to be considered for reduced custody status. The criteria include the length of the original sentence, the length of any mandatory minimum sentence, and the nature of the original offense. When an inmate becomes eligible for consideration under these guidelines, his application for reduction of status is considered by the Institutional Classification Committee. The committee determines whether or not minimum status should be allowed based on several factors, including but not limited to: "field account of the offense, prior criminal record, previous incarcerations, institutional adjustment, and reports from professional and custody staff." 853.4. The DOC standards emphasize that the reduction of status by the committee is discretionary rather than compulsory, and that reduction is a "privilege" rather than a "right".

There appear to be no provisions allowing for an administrative increase of a prisoner's custody status by the committee except for a provision that "[i]n an emergency situation or when additional information is received which negatively affects an inmate's suitability to remain in reduced custody, (i.e., Parole Board Decisions, escape plans, etc.), the inmate's custody level can be increased, temporarily, by order to the Superintendent, Assistant Superintendent, or Director of Custody Operations." 853.-4(B). The provision goes on to require that "such changes must be reviewed and approved by the Institutional Classification Committee at its next regularly scheduled meeting." *Id.* The provision is somewhat ambiguous, but appears to indicate that even the committee may only approve a temporary increase in custody status.

Interfacing with this provision are detailed provisions for disciplinary action against inmates, taken after an inmate has been found guilty of committing a "prohibited act". 251.4. "Attempting or planning an escape" is one such prohibited act, 251.-4(A).102, punishable by, *inter alia*, "the loss of one or more institutional privileges up to 30 days." 251.4(B)(1)(b). The offender is also subject to "administrative action" taken "upon the recommendation of the hearing officer or upon the initiation of the Superintendent," including "[r]eduction in custody status",[2] and "transfer to a more appropriate institution", 251.4(B)(3)(b) and (a). *See also* 254.27 (hearing provisions for transfer from satellite to main institution).

In accordance with the Supreme Court's ruling in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), that the threat of disciplinary sanctions triggers due process safeguards, the DOC standards set out specific procedures for the finding of guilt upon which a sanction may be based. The inmate is allowed a hearing before a hearing officer or a designated "adjustment committee". 254.3. The institution is required to serve the inmate with a disciplinary report, 254.7, and to conduct an investigation within 48 hours of the alleged infraction. 254.10. A hearing must ordinarily be scheduled within seven days of the infraction. 254.13. The inmate is given 24 hours time to prepare a defense. 254.7. He is allowed to call witnesses, 254.18, to present documentary evidence, *id.*, and to cross-examine witnesses, except

---

**2.** Elsewhere in the standards, "reduction" in status denominates the granting of a less restrictive, rather than a more restrictive, status. The reference to "reduction" in the context of sanc-tions may be an inadvertent misstatement. The correct interpretation is probably that an *increase* in custody status may be imposed for a disciplinary infraction.

when unduly hazardous to institutional safety or goals. 254.19. He may request that a staff member represent him. 254.-17. Any finding of guilt must be based on substantial evidence. 254.20. After the hearing, the inmate receives a written statement of the fact findings, including all evidence relied upon or a statement as to why evidence cannot be disclosed, and reasons for any refusal to call a witness or for denying the opportunity for cross-examination. 254.27.

Plaintiff was not afforded any of these procedural protections. Apparently the only process he was given was the opportunity to appear before the prison classification committee. Before the committee, he was not given the opportunity to call witnesses, or to have a staff member represent him. Most significantly, he was not given a written statement of factual findings and of the evidence relied on, nor was the committee bound by the "substantial evidence" standard. Defendants point out that they afforded plaintiff the "opportunity" to take a polygraph examination to resolve the differences between his story and Leester Williams' story, and that plaintiff refused to submit to the polygraph examination. Plaintiff explains that he declined to submit to the examination only because defendants indicated that they would not allow plaintiff's claim to be resolved in this manner unless he would sign a release promising not to sue the prison authorities for his transfer. See Letter of Plaintiff's Counsel, October 23, 1985; cf. Affidavit of Al Procell (11/18/85).

### DISCUSSION

Defendants contend that plaintiff's sudden administrative reclassification did not amount to a violation of due process. Relying upon the DOC standards indicating that the initial determination to reduce status is ultimately discretionary, they claim that plaintiff had no constitutionally protected interest in reduced custody status. See Olim v. Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (plaintiff had no "liberty" interest in not being transferred to out-of-state prison because transfer decision was wholly discretionary for correctional officials under state law, and plaintiff could have no concrete expectation of freedom from transfer). Even if plaintiff's interest in his reduced custody status did constitute a constitutionally protected liberty interest, they argue, plaintiff received all the process he was due when he was afforded the opportunity to appear before the prison Classification Committee. See Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

■ Examination of the DOC standards belies this analysis, however. First of all, with regard to the threshold question of plaintiff's interest in his custody status, it is true that prison inmates have no independent constitutional right to any specific custody status. Cf. Montanye v. Haymes, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976) ("[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight"). Nevertheless, states may, by statute or regulation, create a liberty interest in a particular custody status by setting forth substantive standards for classification which create a legitimate expectation on the part of prisoners to a specific status. Cf. Hewitt v. Helms, 459 U.S. at 472, 103 S.Ct. at 871 (state of Pennsylvania created protected liberty interest in freedom from administrative segregation by "repeated use of explicitly mandatory language in connection with requiring specific substantive predicates" for the imposition of segregation). A state's failure to provide minimum procedural protections in the deprivation of such an interest amounts to a violation of the due process clause.

■ Here, because of the discretionary elements in the classification committee's decision to reduce custody status initially, plaintiff may not have had any liberty interest in reduced status before he was deemed entitled to it, insofar as he could have had no legitimate expectation of it (although the list of substantive factors to

be considered in the decision, *see* 853.4, might be read as creating such an interest).[3] Plaintiff certainly had such an interest in continuing reduced status once he was granted reduced status, however. The standards make no provision for anything more than a temporary revocation of reduced status in emergency situations absent a finding of guilt for committing a "prohibited act". The plaintiff thus had a legitimate expectation of permanent reduced status absent a finding based on substantial evidence presented at a hearing that he had committed a "prohibited act." Here, plaintiff has apparently been reclassified based on hearsay reports that he planned escape, a prohibited act. Rather than affording the procedural protections that must attend disciplinary sanctions, the defendants have apparently bootstrapped the provisions for emergency, temporary, administrative status increases to justify prolonged deprivations of the plaintiff's previously acquired reduced status without a hearing.

The Supreme Court's decision in *Hewitt v. Helms, supra,* is not to the contrary. There, the Court held that a Pennsylvania prisoner did have a liberty interest under Pennsylvania law in remaining in the general prison population and free from administrative segregation. Yet, the Court determined, that the prisoner was entitled to no more than an "informal, nonadversary evidentiary review" prior to segregation. *Id.* at 476, 103 S.Ct. at 874. The segregation contemplated in *Helms* was a temporary removal of the prisoner from the general population pending a more formal disciplinary investigation and hearing, however. Here, the state has effectively permanently increased plaintiff's custody status, while affording him no more process than he would be entitled to for a temporary increase in custody status. Plaintiff's custody status has remained at the increased level for more than a year, and there is no indication that the state considers this to be a temporary condition, subject to change upon more complete investigation. His change in custody did not amount to a temporary administrative segregation for a reasonable period of time; it was effectively a disciplinary sanction. Thus, the more formal process outlined in *Wolff v. McDonnell, supra,* was required in this case; *Hewitt* is simply inapposite.[4]

### CONCLUSION

For the foregoing reasons, the court determines that plaintiff is entitled to a formal disciplinary hearing as a prerequisite to being held in "gang minimum" as opposed to "full minimum" status. The court will therefore order the plaintiff restored to "full minimum" status unless a formal disciplinary hearing is conducted pursuant to DOC disciplinary regulations forthwith. The court notes that plaintiff has also asserted a retaliation theory to justify reduction of his custody status. As that theory involves unresolved factual questions, and the due process theory is in any event preliminary dispositive, the court will not address plaintiff's retaliation theory. Plaintiff will be free to raise it again should the prison fail to give him satisfaction at this disciplinary hearing. Defendants' cross-motion to dismiss is denied.

---

3. *See* the discussion of this issue in *Jones v. Connell,* No. 84–5044 (D.N.J. July 22, 1985). Appendix to Defendants' Brief, pg. 21A.

4. *Gibson v. Lynch,* 652 F.2d 348 (3d Cir.1981) is also not to the contrary. In that case, the court found no constitutional violation in a prisoner's temporary detention in solitary confinement, without a hearing, due to overcrowding in the general prison population. The court noted that a hearing would be required had prison officials segregated the plaintiff for some disciplinary or security reason. *Id.* at 358–360.